# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## WESTERN DIVISION

| | |
|---|---|
| MAYDA J. PATTON,<br><br>     Plaintiff,<br><br> vs.<br><br>NANCY A. BERRYHILL,[1] Acting<br>Commissioner, Social Security<br>Administration,<br><br>     Defendant. | CIV. 10-5016-JLV<br><br><br>ORDER |

## INTRODUCTION

On September 5, 2006, plaintiff Mayda J. Patton applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-33, 1381-83f (2006), respectively. (Administrative Record, pp. 12, 101-07).[2] Following an adverse decision, Ms. Patton timely filed her complaint in district court. (Docket 1). On November 28, 2011, the court entered an order vacating the decision of the Commissioner and remanding Ms. Patton's case for a new hearing. (Docket 32). The court retained jurisdiction pursuant to sentence six of 42 U.S.C. § 405(g).

---

[1]Nancy A. Berryhill became the Acting Commissioner of Social Security on January 20, 2017. Pursuant to Fed. R. Civ. P. 25(d), Ms. Berryhill is automatically substituted for Carolyn W. Colvin as the defendant in all pending social security cases. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]The court will cite to information in the administrative record by referencing "AR at p. ____."

<u>Id.</u> at p. 12.   On July 8, 2016, the Commissioner filed a motion to reopen the

case.   (Docket 91).   The Commissioner reported that on January 13, 2016, an

administrative law judge ("ALJ") "issued a partially favorable decision, finding

[Ms. Patton] disabled beginning December 29, 2014, for purposes of DIB and

SSI."   (Docket 92 ¶ 4).   The court granted the motion to reopen the case.

(Docket 95).   Ms. Patton filed a motion seeking reversal of the decision of the

Commissioner and requesting an order for calculation and payment of benefits.

(Docket 99).   Ms. Patton seeks DIB and SSI benefits for the time period August

8, 2006, through December 28, 2014, and asks the court to require the

Commissioner to compute benefits.[3]   (Docket 100).   For the reasons stated

below, plaintiff's motion to reverse the decision of the Commissioner is granted in

part.

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by

substantial evidence in the record as a whole.   42 U.S.C. § 405(g); <u>Choate v.

Barnhart</u>, 457 F.3d 865, 869 (8th Cir. 2006); <u>Howard v. Massanari</u>, 255 F.3d

577, 580 (8th Cir. 2001).   The court reviews the Commissioner's decision to

determine if an error of law was committed.   <u>Smith v. Sullivan</u>, 982 F.2d 308,

311 (8th Cir. 1992).   "Substantial evidence is less than a preponderance, but is

enough that a reasonable mind would find it adequate to support the

---

[3]Ms. Patton does not challenge the portion of the Commissioner's decision
finding her disabled as of December 29, 2014.   (Docket 99).

2

Commissioner's conclusion." <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005) (quoting <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " <u>Reed</u>, 399 F.3d at 920 (quoting <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act. <u>See</u> <u>Smith</u>, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to SSI benefits under Title XVI. 20 CFR § 416.920(a).[4] If the ALJ determines a

---

[4]The criteria under 20 CFR § 416.920 are the same under 20 CFR § 404.1520. <u>Boyd v. Sullivan</u>, 960 F.2d 733, 735 (8th Cir. 1992). All further references will be to the regulations governing disability insurance benefits, unless otherwise specifically indicated.

claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled. Id. The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998). Each of the ALJs involved in Ms. Patton's case applied the five-step sequential evaluation required by the Social Security Administration regulations.[5]

## FACTUAL AND PROCEDURAL HISTORY

On June 8, 2016, the Commissioner moved "to reopen . . . the case in accordance with sentence six of 42 U.S.C. § 405(g)." (Docket 91). Ms. Patton filed a motion seeking to reverse in part the decision of the Commissioner and requested an order for calculation and payment of benefits. (Docket 99). The court granted the Commissioner's motion and established a briefing schedule. (Docket 95). The parties filed their joint statement of material facts ("JSMF"). (Docket 98 at pp. 1-161). The parties' JSMF are incorporated by reference.

---

[5]A total of five ALJs were involved in Ms. Patton's case. For clarity, they will be referred to by number and not by name.

The parties also filed a joint statement of disputed facts ("JSDF").[6]  (Docket 98-1).

Ms. Patton's case has a long and protracted history.  The court will identify the principal steps along the way in this nearly 12-year-old case.

On September 5, 2006, Ms. Patton applied for DIB and SSI benefits. (Docket 98 ¶ 1).  On April 2, 2009, ALJ #1 found at step one that Ms. Patton had "not engaged in substantial gainful activity since August 8, 2006 . . . ."  (AR at p. 15) (bold omitted).  At step two, ALJ #1 found she had "the following severe impairments: memory impairment with borderline intellectual functioning;[7] depressive syndrome;[8] diabetes mellitus; asthma . . . ."  Id. (bold omitted).  At step four, ALJ #1 found Ms. Patton had "the physical residual functional capacity to perform light work[9] . . . [and] the mental residual functional capacity

_____

[6]The parties dispute the interpretation of the testimony of Michael Enright, Ph.D.  (Docket 98-1).  The court finds the JSDF are factually accurate as contained in the administrative record and the testimony of Dr. Enright will be referenced where appropriate.

[7]Ms. Patton has "a full scale IQ of 76, indicating borderline general intelligence."  (Docket 98 ¶ 270; see also Docket 98-1 ¶ 2).

[8]"The principal types of depression are major depression, dysthymia, and bipolar disease (also called manic-depressive disease)."  MedicineNet.com.

[9]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 CFR § 404.1567(b).

["RFC"]to perform simple repetitive, routine, unskilled work with no assembly line and no quota or pace requirements." Id. at p. 17 (bold omitted); see also Docket 98 ¶ 9. ALJ #1 found Ms. Patton was "capable of performing past relevant work as a fast food worker[10] and Cashier II . . . . [and] not under a disability . . . from August 8, 2006 through [April 2, 2009]." (AR at p. 20). Following an adverse decision, Ms. Patton timely filed her complaint in district court. (Docket 1).

On November 28, 2011, the court entered an order vacating the decision of the Commissioner and remanding for new hearing. (Docket 32). In summary, the court remanded the case to the Commissioner because ALJ #1 failed to request and consider approximately one hundred pages of Ms. Patton's medical records. Id. at p. 11. The court retained jurisdiction "pursuant to sentence six of 42 U.S.C. § 405(g)." Id. at p. 12. The court required the Commissioner to "file [] status report[s] . . . as to the progress of the case on remand."[11] (Docket 34).

Following remand, ALJ #2 conducted a hearing on December 19, 2012, at which two medical experts testified. (Docket 98 ¶ 15). ALJ #2 issued an unfavorable decision on January 17, 2013. Id. ¶ 31. At step one, ALJ #2 again found that Ms. Patton had "not engaged in substantial gainful activity since

---

[10]This was Ms. Patton's "current part-time job." (Docket 98 ¶ 10).

[11]Over the course of the next three and one-half years, the Commissioner filed 45 status reports. (Dockets 35-40, 43-47, 49-58, 60-63 & 70-91).

August 8, 2006 . . . ." (AR at p. 626) (bold omitted). At step two, ALJ #2 found

Ms. Patton had "the following severe impairments: diabetes, mild degenerative

disk disease of the lumbar spine, a history of right knee surgery, obesity,

asthma, hypertension, depression and borderline intellectual functioning . . . ."

Id. at p. 627 (bold omitted). ALJ #2 found at step four, Ms. Patton had "the

residual functional capacity to perform sedentary work[12] . . . and can

understand, remember and carry out simple instructions." Id. at p. 630.

However, at step five, ALJ #2 found Ms. Patton retained the capacity to "perform

light jobs." (Docket 98 ¶ 33) (emphasis in original) (referencing AR at p. 644).

The "representative occupations" consisted of the following:

> [C]ashier II . . . with 100,000 such jobs in the U.S. and 4,000 South
> Dakota, with a 25% erosion in the incidence of such jobs due to the
> claimant's restrictions; merchandise marker . . . with 700,000 such
> jobs in the U.S. and 2,200 in South Dakota; and collator operator
> . . . with 50,000 such jobs in the U.S. and 100 in South Dakota.

(AR at p. 644).

---

[12]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR § 404.1567(a). "Occasional" is defined as "occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday." Titles II & XVI: Determining Capability to Do Other Work—Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work, SSR 96-9p (S.S.A 1996); see also Titles II & XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2, 1983-1991, SSR 83-10 (S.S.A. 1983). The amount of sitting required in a sedentary job, "would generally total about 6 hours of an 8-hour workday." SSR 96-9p.

Ms. Patton timely filed exceptions with the Appeals Council. (Docket 98 ¶ 34). On May 7, 2013, "the Appeals Council assume[d] jurisdiction for further administrative proceedings on the issue identified by the District Court." (Docket 41-1 at p. 3).[13] The Appeals Council vacated the decision of ALJ #2 and remanded Ms. Patton's case to an ALJ to resolve the following issue:

> The step 5 conclusion is not supported by substantial evidence. In finding the claimant capable of performing jobs that exist in significant numbers in the national economy, the decision cited representative occupations that exceed the claimant's residual functional capacity. In the residual functional capacity, the hearing decision found the claimant capable of, in part, lifting up to 10 pounds and standing and/or walking for 2 hours in an 8-hour workday. (Decision, page 8). However, all three of the representative occupations (cashier II, merchandise marker, and collator operator) are performed at the light exertional level. In fact, an audit of the hearing recording reveals that the vocational expert provided these jobs in response to the first hypothetical that described an individual who can, in part, lift and carry 20 pounds occasionally, 10 pounds frequently, and stand/walk for 6 hours in an 8-hour workday. When posed with a hypothetical consistent with the claimant's residual functional capacity, the vocational expert testified that an individual could not perform any of the jobs noted above. Further evaluation is required.

Id. at pp. 3-4. The Appeals Council ordered on remand that an ALJ develop the following:

> Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . . The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). . . .

---

[13]The court cites to the page of a document as filed in CM/ECF and not to the internal page of the document itself.

Id. at p. 4.   The ALJ was directed to offer Ms. Patton "the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision."   Id.

On July 12, 2013, ALJ #2 issued an unfavorable decision.[14]   (Docket 98 ¶ 38).   ALJ #2 again found that Ms. Patton had "not engaged in substantial gainful activity since August 8, 2006 . . . ."   (AR at p. 666) (bold omitted).   ALJ #2 found Ms. Patton had the same severe impairments as contained in ALJ #2's earlier decision.   Id.; see id. at p. 627.   ALJ #2 again found Ms. Patton had "the residual functional capacity to perform sedentary work . . . and can understand, remember and carry out only simple instructions."   (AR at p. 670).   ALJ #2 found Ms. Patton was not disabled because she could perform the following sedentary jobs: microfilm document preparer "of which 100,000 jobs exist in the national economy;" addresser, "of which 20,000 jobs exist in the national economy;" and sack repairer "of which 12,000 jobs exist in the national economy."   Id. at p. 684; see also Docket 98 ¶ 38.

Ms. Patton timely appealed to the Appeals Council.   (Docket 98 ¶ 39). Plaintiff's counsel also referred Ms. Patton "to a vocational evaluation center to assess her ability to perform the sedentary jobs [ALJ #2] found [she] could do." Id. ¶ 40.   On August 7, 2013, Ms. Patton submitted the results of the vocational testing to the Appeals Council.   Id. ¶ 42.

---

[14]Ms. Patton waived appearance at the second remand hearing for personal reasons.   (Docket 98 ¶ 37).

On January 2, 2014, the Appeals Council again assumed jurisdiction of Ms. Patton's case.  Id. ¶ 43; AR at p. 702.  The order of the Appeals Council identified two areas of concern.  (AR at pp. 702-03; see also Docket 98 ¶ 43). The first area of concern was that Ms. Patton's vocational testing "using the standardized SAGE battery suggested 'difficulty with sustained repetitive activities using hands and performing job tasks requiring these abilities, particularly within tight time constraints . . . .' "  (Docket 98 ¶ 44) (referencing AR at p. 702).  These results were concerning because the test occurred "less than one month after [ALJ #2's] decision and was 'material to the step five finding.' "  Id. (referencing AR at p. 702).  The second concern was that ALJ #2 identified three jobs in the national economy but did not reference the testimony of the vocational expert which identified the number of South Dakota positions available for each of those jobs:  microfilm document preparer, 200; addresser, 100; and sack repairer, 50.  Id. ¶ 45; see also AR at pp. 931-32.  The Appeals Council found these South Dakota numbers were not significant.  (Docket 98 ¶ 46).  The Appeals Council concluded: "Although the number of national jobs appears to represent a significant number of jobs, the number of local jobs identified does not appear to represent a significant number of jobs. Accordingly, further evaluation as to whether a significant number of other jobs exist is necessary."  (AR at p. 703).

On remand, the Appeals Council directed a newly assigned ALJ, among other things, to "[o]btain supplemental evidence from a vocational expert to

10

clarify the effect of the assessed limitations on the claimant's occupational base

. . . . [and] ask the vocational expert to identify examples of appropriate jobs and

state the incidence of such jobs in the national economy (20 CFR 404.1566 and

416.966)." Id.

A third remand hearing was held on April 3, 2014. (Docket 98 ¶ 47). On

June 18, 2014, ALJ #3 issued an unfavorable decision. Id. ¶ 48. At step one,

ALJ #3 found Ms. Patton had "not engaged in substantial gainful activity since

August 8, 2006 . . . ." (AR at p. 433) (bold omitted). At step two, ALJ #3 found:

> [Ms. Patton had] the following severe impairments: obesity . . . ;
> insulin-dependent diabetes mellitus; reactive airways disease (with
> components of asthma, episodic bronchitis and allergies); mild
> degenerative changes, lumbar spine, . . . with clinical presentations
> of left-side sciatica and mild facet arthrosis (considered severe only
> when viewed in combination with obesity); osteoporosis; history of
> fracture of the superior pole of the right patella (status post open
> reduction, internal fixation (12/10)); major depression; recurrent,
> mild; dysthymia;[15] anxiety disorder; and borderline intellectual
> functioning . . . .

Id. at p. 435 (bold omitted).

ALJ #3 found Ms. Patton had "the residual functional capacity to perform

less than the full range of light work [with physical limitations] . . . . [and]

[m]entally . . . retains the capacity to understand, remember, and carry out

short, simple instructions; interact appropriately with supervisors, co-workers

---

[15]"Dysthymia is a type of depression involving long-term, chronic
symptoms that are not disabling, but keep a person from functioning at 'full
steam' or from feeling good. Dysthymia is a less severe type of depression than
what is accorded the diagnosis of major depression. However, people with
dysthymia may also sometimes experience major depressive episodes,
suggesting that there is a continuum between dysthymia and major depression."
MedicineNet.com.

and the public on a frequent basis; respond appropriately to changes in a routine work setting; and make judgments on simple work-related decisions." (AR at p. 439) (bold omitted).

ALJ #3 found Ms. Patton not disabled because she retained the capacity to perform "work that exists in . . . the national economy." Id. at p. 451. ALJ #3 identified those representative light occupations as:

> Mail clerk, with "50,000 positions nationally," and "1200 to 1500 positions regionally";[16]
>
> Tanning salon attendant, with "20,000-30,000 [positions] nationally," and "500 [positions] regionally"; and
>
> Small products assembler, with "75,000 [positions] nationally" and "3000 [positions] regionally."

Id.

Ms. Patton appealed the decision of ALJ #3 to the Appeals Council. (Docket 98 ¶ 50). For a third time, on August 25, 2014, the Appeals Council assumed jurisdiction of Ms. Patton's case. (AR at p. 396). The remand order of the Appeals Council identified two errors by ALJ #3. First, the "decision did not evaluate the opinion of . . . Dr. Mark Farber . . . [who testified Ms. Patton was] 'restricted' to sedentary work[17] . . . . The January 17, 2013 and July 12, 2013 decisions gave Dr. Farber's opinion great weight and assessed a sedentary

---

[16]"[T]he region [is] defined as Minnesota, Iowa, North Dakota, and South Dakota." (AR at p. 451).

[17]The Appeals Council also observed "Dr. Farber noted that Craig Mills, M.D., indicated [Ms. Patton] could ambulate for sedentary work . . . ." (AR at p. 396).

residual functional capacity . . . ." Id. at pp. 395-96[18] (references to the administrative record omitted).   Second, even though ALJ #3 found Ms. Patton's "severe mental impairments include borderline intellectual functioning . . . the Administrative Law Judge did not pose a hypothetical question to the vocational expert that assumed the individual with borderline intellectual functioning . . . ." Id. at p. 395 (references to the administrative record omitted).

On remand, the Appeals Council directed the ALJ to "evaluate the opinion of Dr. Farber . . . . [and] [t]he hypothetical questions [to a vocational expert] should reflect the specific capacity/limitations established by the record . . . . [and] ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966)." Id.

On March 11, 2015, ALJ #4 presided over a fourth remand hearing. (Docket 98 ¶ 55).   The vocational expert testified "a single job matched the hypothetical RFC for sedentary work requiring 'low-level' math, manual and finger dexterity: Surveillance System Monitor, . . . with 'regional jobs or within the state of South Dakota' numbering 43." Id. ¶ 56.

On March 25, 2015, at step two, ALJ #4 found Ms. Patton "had the following severe impairments: (1) Borderline intellectual functioning; (2) Obesity; (3) Degenerative disc disease of the lumbar spine with left sciatica; and (4) Fractured right patella, status post repair in December 2010 . . . ."   (AR at

---

[18]Page two of the Appeals Council's August 25, 2014, decision is filed in the administrative record ahead of page one of the decision.

p. 2057) (citations and bold omitted).   At step four, ALJ #4 found "since August 8, 2006," Ms. Patton had a "residual functional capacity to perform sedentary work . . . . Furthermore, when considering the borderline intellectual functioning despite a history of semi-skilled work activities, the sedentary work activities should involve a SVP[19] of only one or two."   (AR at p. 2062).   At step five, finding Ms. Patton had an "inability to perform past relevant work," ALJ #4 "relied on Medical-Vocational Rule 201.28 to find that Patton was capable of performing a significant number of other jobs from August 8, 2006, to December 29, 2014 . . . ."   (Docket 98 ¶ 60).

ALJ #4 found that as of Ms. Patton's 50th birthday her "age category changed to an individual closely approaching advanced age."   (AR at p. 2070) (citing 20 CFR § 404.1563 and § 416.963).   Based on that ruling, ALJ #4 found that "considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform . . . ."   Id. at p. 2072 (citations

---

[19]See AR at pp. 1988-89.   "SVP" stands for "Specific Vocational Preparation."   United States Department of Labor, Dictionary of Occupational Titles, Appendix C, II.   "Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   Id.   "SVP 2" indicates that the "level[] of specific vocational preparation [will take] . . . [a]nything beyond short demonstration up to and including 1 month . . . ."   Id.   The higher the number the longer the time period required to achieve vocation preparation.   Id.   The Dictionary of Occupational Titles is available at http://www.oalj.dol.gov.

and bold omitted). With this finding, ALJ #4 concluded Ms. Patton was disabled as of December 29, 2014. Id.

Ms. Patton timely appealed to the Appeals Council from the decision of ALJ #4. (Docket 98 ¶ 62). On August 31, 2015, the Appeals Council assumed jurisdiction of the case for a fourth time. (AR at p. 2091). It affirmed ALJ #4's finding that Ms. Patton "was disabled beginning December 29, 2014." Id. The Appeals Council vacated the remainder of the decision "as it relates to the period prior to December 29, 2014." Id. While ALJ #4 found Ms. Patton's depression and anxiety were only non-severe impairments, the Appeals Council observed "[t]he medical evidence of record indicates multiple diagnoses of major depression."[20] Id. at p. 2092 (citations omitted). The Appeals Council discussed the record on depression and anxiety.

> The claimant was taking medications for her depression and was on a medication management program . . . . In addition, a consultative examination performed by Richard P. Renka, M.D., on December 8, 2014, indicates the claimant was seen for depression and anxiety; she was taking psychiatric medications of mirtazapine, Prozac and Valproic Acid; her major depression was only partially treated; and her medical problems were increasing in severity and taking a toll on her energy and mood . . . . An earlier consultative examination performed by Greg Swenson, Ph.D., on December 18, 2006, indicates the claimant acknowledges anxiety and reported she becomes angry frequently and is capable of volatile behavior when angry . . . . Further evaluation of the claimant's depression/anxiety is warranted.

---

[20]Major depressive disorder, also referred to as clinical depression, is characterized by a combination of symptoms that lasts for at least two weeks in a row that interfere with the ability to work, sleep or eat and a decreased interest or pleasure in most activities. MedicineNet.com.

Id. (citations omitted).   The Appeals Council ruled that because Ms. Patton has a "severe mental impairment . . . acquiescence ruling AR 14-1(8) (the 8th Circuit rule) did not permit use of [Medical-Vocational Rule 201.28] to decide the case." (Docket 98 ¶ 64; see also AR at p. 2092).   On remand, the Appeals Council ordered the ALJ to:

> Further evaluate the severity and combined effects of all the claimant's mental impairments[21] in accordance with the special technique described in 20 CFR 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c).
>
> Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations . . . .
>
> At step five, comply with Acquiescence Ruling 14-1(8) and obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . . The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). . . .

(AR at p. 2092; see also Docket 98 ¶¶ 65-67).   The Appeals Council directed the ALJ to "issue a new decision on the issue of disability before December 29, 201[5]."   (AR at p. 2093).

---

[21]Because ALJ #4 found only that Ms. Patton suffered from borderline intellectual functioning, it must be presumed that the Appeals Council was making specific reference to both Ms. Patton's borderline intellectual functioning and her severe major depression.

On September 22, 2015, ALJ #5 conducted a fifth remand hearing. (Docket 98 ¶ 69). Because the hearing had to be recessed, Dr. Matthew Sprong, a vocational expert, testified on October 29, 2015. (AR at pp. 1947-48 & 1975). Dr. Sprong testified there were three jobs[22] which Ms. Patton could perform:

Final Assembler, with 30,100 jobs nationally and 92 regionally;
Dowel Inspector, with 13,030 jobs nationally and 40 regionally; and
Bench Hand, with 30,200 jobs nationally and 95 regionally.

(Docket 98 ¶ 71). Dr. Sprong defined "region" as "Montana, Wyoming, and North Dakota." (Docket 98 ¶ 81). He testified he did not have job figures for South Dakota. (AR at p. 1992). While Dr. Sprong acknowledged each of these jobs permitted standing, he testified "to maintain enough productivity . . . anything more than every 30 minutes would preclude employment. So, 30 minutes would be the, threshold alternating between sitting and standing . . . ." Id. ¶¶ 72 and 73.

When asked to compare aptitude level requirements for each of these jobs with hypothetical vocational aptitudes,[23] Dr. Strong's testimony resulted in the following comparison:

---

[22]Each of these jobs had a "SVP 2." (Docket 98 ¶ 71).

[23]The hypothetical scores are the levels achieved by Ms. Patton in testing at the Vocational Evaluation Center of the Black Hills Special Services Cooperative on August 2, 2013. (AR at pp. 1059-62). The higher the number, the lower the skill set. Id. at p. 1061.

| Job | Aptitudes | Aptitude Level Required | Hypothetical Aptitude Level |
|---|---|---|---|
| Final Assembler | Clerical Aptitude | 5 | 4 |
| | Motor Coordination | 3 | 4 |
| | Finger Dexterity | 3 | 5 |
| | Manual Dexterity | 3 | 4 |
| Dowel Inspector | Clerical Aptitude | 5 | 4 |
| | Motor Coordination | 4 | 4 |
| | Finger Dexterity | 3 | 5 |
| | Manual Dexterity | 3 | 4 |
| Bench Hand | Clerical Aptitude | 5 | 4 |
| | Motor Coordination | 3 | 4 |
| | Finger Dexterity | 2 | 5 |
| | Manual Dexterity | 3 | 4 |

Id. ¶¶ 74-75.

On January 13, 2016, ALJ #5 issued an unfavorable decision.   Id. ¶ 76;

see also AR at pp. 1821-40.   At step one, ALJ #5 found Ms. Patton "has not been

engaged in substantial gainful activity since [August 8, 2006] . . . ."   (AR at

p. 1825) (citations and bold omitted).   At step two, ALJ #5 found that since

"August 8, 2006, the claimant has had the following severe impairments:

borderline intellectual functioning, major depressive and dysthymic disorder,

obesity, degenerative disk disease of the lumbar spine with left sciatica, and

fractured right patella, status post repair in December of 2010 . . . ."   Id. at

p. 1826 (citations and bold omitted).

At step four, ALJ #5 found that "since August 8, 2006, and up until

December 28, 2014, the claimant had the residual functional capacity to perform

sedentary work . . . except for the following mental limitations during the period in question: The claimant had the ability to remember locations and work-like procedures; had the ability to understand and remember short and simple instructions; had the ability to carry out short, simple instructions; and had the ability to maintain attention and concentration for extended periods." Id. at p. 1829 (citations and bold omitted). ALJ #5 went on to describe the things Ms. Patton could do.

> Prior to December of 2014, the claimant had no limitations regarding her ability to concentrate, focus, or stay on task. The claimant had the ability to perform work within a schedule, maintain regular attendance, and be punctual within customary tolerances. She had the ability to sustain ordinary routine without special supervision and could work in combination with others without being distracted. The claimant could make simple work related decisions; could complete normal workdays and workweeks without interruption from psychologically based symptoms; and was able to perform at consistent pace without an unreasonable number and length of rest periods. She had the ability to interact appropriately with the general public and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. The claimant could maintain socially appropriate behavior and could adhere to the basic standards of neatness and cleanliness. In addition, she had the ability to ask simple questions and ask for assistance. She had the ability to accept instructions or respond appropriately to criticism from supervisors. She could respond appropriately to changes in the work setting and had the ability to be aware of normal hazards and take appropriate precautions. She had the ability to travel to unfamiliar places and use public transportation. She had the ability to set realistic goals and make plans independently of others.

Id. (bold omitted).

At step five, ALJ #5 found Ms. Patton's "mental limitations . . . eroded the unskilled sedentary occupational base . . . ." Id. at pp. 1839-40. ALJ #5

accepted Dr. Sprong's identification of the three jobs described above with the national and regional numbers referenced.  Id. at p. 1840.  ALJ #5 found "the numbers of jobs available in the national economy are significant."  Id. According to ALJ #5, by these three jobs Ms. Patton "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy."  Id.; see also Docket 98 ¶ 80.

On June 7, 2016, the Appeals Council declined to assume jurisdiction. (Docket 98 ¶ 82).  Among its other assertions, the Appeals Council concluded "the decision [of ALJ #5] reveals the vocational expert cited almost 75,000 jobs nationally . . . and 20 CFR 404.1566 and 416.966 states we consider work that exists in the national economy when it exists in significant numbers either in the region in which the claimant lives OR in several other regions.  Therefore, the citation of 74,330 available jobs was a significant number."  (AR at p. 1808) (capitalization in original; other citations omitted).

The decision of ALJ #5 constitutes the final decision of the Commissioner. Id.; see also Docket 98 ¶ 83.  On June 29, 2016, the Commissioner reported to the court that "the Appeals Council declined to assume jurisdiction . . . rendering the January [13], 2016, Administrative Law Judge's decision as the final decision . . . after remand by the court."  (Docket 90 at p. 1).

## ANALYSIS

The issue before the court is whether the decision of ALJ #5 of January 13, 2016, that Ms. Patton was not disabled from August 8, 2006, through December

28, 2014, is supported by substantial evidence in the record as a whole.   (AR at p. 1840); see also Howard, 255 F.3d at 580 ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

SIGNIFICANT NUMBER OF JOBS

The first issue the court feels compelled to resolve is whether the three jobs identified by ALJ #5 constitute a significant number of jobs requiring a finding that Ms. Patton is not disabled.[24]   The "burden of production shifts to the Commissioner at step five."   Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); see also Baker, 159 F.3d at 1144.   The Commissioner's finding must be upheld if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Choate, 457 F.3d at 869; Howard, 255 F.3d at 580.

Federal law provides:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which

_____

[24]For purposes of this analysis the court presumes the findings of ALJ #5 at steps one through four were correct.   In the event the decision of this court is reversed, the court reserves the right on remand to resolve the other challenges raised by plaintiff to the decision of ALJ #5.

<u>exists in significant numbers either in the region where such individual lives or in several regions of the country</u>.

42 U.S.C. § 423(d)(2)(A) (emphasis added). The Social Security regulations define the determination of jobs in the national economy in the following manner:

> Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy[.]"

20 CFR § 404.1566(b). The regulation states that "jobs in the national economy" means "in significant numbers either in the region where you live or in several regions of the country." <u>Id.</u> § 404.1566(d). Since Ms. Patton "cannot perform her past relevant work, the Commissioner bears the burden of showing that [she] could perform jobs that exist in significant numbers." <u>Hall v. Chater</u>, 109 F.3d 1255, 1259 (8th Cir. 1997).

The Commissioner argues Ms. Patton is not disabled because the law "does not require that the job opportunities exist within the local area, but only that the job opportunities exist in the national economy." (Docket 101 at p. 22) (referencing 42 U.S.C. § 423(d)(2)(A)). Ms. Patton argues she must be found disabled because in January 2014 the Appeals Counsel ruled "that 350 jobs in a single state were not significance, *a fortiori*, 227 regional jobs [in 2016] are not significant." (Docket 100 at p. 34). The Commissioner contends plaintiff's argument is without merit because "the Appeals Council action . . . related to a

prior ALJ decision that was not the Commissioner's final administrative decision." (Docket 101 at p. 23).

The United States Court of Appeals for the Eighth Circuit addressed this issue several times. In <u>Jenkins v. Bowen</u>, 861 F.2d 1083 (8th Cir. 1988), the court concluded 500 jobs in the St. Louis, Missouri, area were a significant number, particularly since claimant had 25 years of experience in the same line of work. <u>Id.</u> at 1087. In <u>Johnson v. Chater</u>, 108 F.3d 178 (8th Cir. 1997), the court observed:

> The vocational expert noted that the addresser and document preparer jobs were sedentary, unskilled labor that Johnson could perform, and that there existed 200 jobs of addresser or document preparer in Iowa and 10,000 in the national economy. The vocational expert further testified that these figures were merely representative of a larger category of jobs that Johnson could perform, including telemarketing. The vocational expert did not give figures to describe the total number of unskilled, sedentary jobs in Iowa or the national economy. However, at the time of the hearing before the ALJ, Johnson was engaged in one of the sedentary jobs that the vocational expert said she was capable of performing, telemarketing.

<u>Id.</u> at 180. With this fact-intensive record the court concluded "the Commissioner met her burden of showing that Johnson is not disabled because the vocational expert's testimony was sufficient to show that there exist a significant number of jobs in the economy that Johnson can perform." <u>Id.</u>

In <u>Long v. Chater</u>, 108 F.3d 185 (8th Cir. 1997), the court affirmed the decision of an ALJ who found that "650 jobs [in Iowa] in the fields of surveillance monitoring, addressing, and document preparation that exist in Iowa, or one of the 30,000 such jobs that exists nationwide" constituted "a significant number."

Id. at 188.   In <u>Hall v. Chater</u>, 109 F.3d 1255 (8th Cir. 1997), the court upheld an

ALJ's decision because 1,045 receptionist jobs and 5,227 cashier jobs, "when

added to the 218 order clerk and 122 information clerk jobs [in the state of

Arkansas] . . . constitute a significant number of jobs available to Hall."   <u>Id.</u> at

1259 (referencing <u>Jenkins</u>, 861 F.2d at 1087).   The court concluded "[t]here is

no evidence to give us pause in concluding that the ALJ used common sense in

applying the significant numbers requirement to Hall's particular factual

situation."   <u>Id.</u> at 1260 (referencing <u>Johnson</u>, 108 F.3d at 180; <u>Long</u>, 108 F.3d at

188–89; <u>Jenkins</u>, 861 F.2d at 1087).

In <u>Weiler v. Apfel</u>, 179 F.3d 1107 (8th Cir. 1999), the court held that

consistent with "Weiler's physical and psychological condition, age, education,

and work experience" substantial evidence existed that "32,000 surveillance

monitor positions nationwide . . . . [constitute] a significant number of jobs in the

economy which Weiler can perform."   <u>Id.</u> at 1111.   In <u>Jones ex rel. Morris v.</u>

<u>Barnhart</u>, 315 F.3d 974 (8th Cir. 2003), a vocational expert testified there were

approximately 75,000 surveillance system monitor positions nationwide.   <u>Id.</u> at

979.   "Moreover, the record indicates that Morris could perform the other two

jobs identified by the vocational expert . . . ."   <u>Id.</u>   The court concluded "there is

substantial evidence supporting the ALJ's determination that there were a

significant number of jobs in the economy that Morris could perform."   <u>Id.</u>

In <u>Osborne v. Barnhart</u>, 316 F.3d 809 (8th Cir. 2003), the court found

3,000 assembly jobs, when added to 5,400 cleaning and janitorial jobs,

390 packer and wrapper jobs and 1,000 jobs as a stock handler all in the state of
Missouri "far exceed levels . . . considered sufficient to constitute a 'significant
number.' " Id. at 812 (referencing Hall, 109 F.3d at 1259; Jenkins, 861 F.2d at
1087).

With this Eighth Circuit guidance, the court notes the rulings of a number
of courts which each made specific reference to the number of jobs available in a
plaintiff's state of residence as being significant at step five.[25]

> Rogers v. Barnhart, No. CIV. 4-02-CV-10090, 2003 WL 22052204,
> at *3 (S.D. Iowa Mar. 6, 2003) (surveillance monitor, 25,000 jobs
> nationally and 300 jobs in Iowa);
>
> Jackson v. Astrue, No. 4:07CV00796, 2008 WL 2783474 (E.D. Ark.
> July 15, 2008) (pharmacy technician, 267,000 jobs nationally and
> 2,370 in Arkansas; security guard, 994,220 positions in the United
> States and 6,240 in Arkansas; file clerk I or II, with 230,000 jobs
> nationwide and 1,950 in the state; teacher's aide, with 105,000 jobs
> in the United States and 722 in Arkansas);
>
> Murphy v. Astrue, No. 8:09CV89, 2009 WL 3763673, at *11 (D. Neb.
> Nov. 9, 2009) (330 order caller and 175 assembler positions in
> Nebraska);
>
> Olatubosun v. Astrue, No. 8:09CV376, 2010 WL 3724819, at *15 (D.
> Neb. Sept. 17, 2010) (document preparer, 6,600 jobs nationally and
> 350 jobs in Nebraska and a three state region (jointly "region");
> cutter and paster, 5,500 jobs nationally and 200 jobs in the region;
> change account clerk, 17,000 jobs nationally and 1,200 jobs in the
> region. Plaintiff notes that, "assuming equal distribution" of jobs
> among the four states included in the region, there are only
> approximately 437 suitable jobs available him in Nebraska. "[T]o
> the extent that the Plaintiff suggests that 437 jobs is [sic] insufficient
> as a matter of law, his argument must be rejected.");

---

[25]The court limits this list to those cases which have national or regional
job numbers reasonably comparable to the numbers acknowledged to exist in
this case.

Slavicek v. Astrue, No. CIV. 09-2432, 2010 WL 5421444, at *21 (D. Minn. Dec. 2, 2010), report and recommendation adopted, No. CIV. 09-2432, 2010 WL 5421341 (D. Minn. Dec. 23, 2010), *aff'd sub nom.* Slavicek v. Colvin, 527 Fed. Appx. 590 (8th Cir. 2013) (500 jobs in the state of Minnesota);

Gustafson v. Astrue, No. CIV. 10-4962, 2011 WL 6219641, at *8 (D. Minn. Nov. 29, 2011), report and recommendation adopted, No. CIV. 10-4962, 2011 WL 6218211 (D. Minn. Dec. 14, 2011) (order clerk, 1,300 jobs exist in the state of Minnesota. "Therefore, even assuming only for the sake of argument that the order clerk job was found to be inconsistent with the DOT, the Plaintiff would still be able to perform another job existing in significant numbers in the regional economy.");

Ferro v. Astrue, No. 10-2190, 2012 WL 3160357, at *6 (W.D. Ark. Aug. 3, 2012) (crossing guard, 20,000 nationally and 70 in the state of Arkansas; surveillance systems monitor, 27,000 jobs nationally and 600 in Arkansas. The magistrate judge concluded "[w]hile the number of jobs available as a crossing guard [70] would be problematic the number of jobs available as a surveillance system monitor [600] would certainly meet the test.")

Applegate v. Colvin, No. 4:12CV3029, 2013 WL 1222124, at *15 (D. Neb. Mar. 25, 2013) (610 jobs in Nebraska);

Wilson v. Colvin, No. 12-3054, 2013 WL 3230252, at *6 (W.D. Ark. June 26, 2013) (dishwasher, 191,000 jobs nationally and 1,600 jobs regionally; janitors and cleaners, 161,483 jobs nationally and 1,300 jobs locally);

Welsh v. Colvin, No. C12-0102, 2013 WL 3338419, at *19 (N.D. Iowa July 2, 2013), *aff'd*, 765 F.3d 926 (8th Cir. 2014) (330 jobs in Iowa constituted "a significant number of jobs in the national economy.");

Weaver v. Colvin, No. 4:12CV00220, 2013 WL 3716512, at *6 (E.D. Ark. July 11, 2013) (74 surveillance system monitoring jobs, 177 escort vehicle driver jobs, and 172 document preparer jobs all in the state of Arkansas);

Whited v. Colvin, No. 4:12-CV-3158, 2013 WL 3897754, at *4 (D. Neb. July 26, 2013) (usher, 30,000 jobs nationally and 500 jobs in Nebraska; furniture rental consultant, 20,000 nationally, 200 jobs

in Nebraska; and livestock sales representative, 75, 000 jobs nationally and 5,000 positions in Nebraska);

Brown v. Colvin, No. 4:12CV3260, 2014 WL 200234, at *19 (D. Neb. Jan. 16, 2014) (79,280 jobs nationally and 500 jobs in Nebraska);

Brown v. Colvin, No. 4:13CV3042, 2014 WL 1218664, at *9 (D. Neb. Mar. 24, 2014) (850 jobs in Nebraska);

Partain v. Colvin, No. 4:13CV000168, 2014 WL 5524408, at *5 (E.D. Ark. Oct. 31, 2014) (production assembler, 27,800 jobs nationally and 368 jobs in Arkansas; machine tender, 19,886 jobs nationally and 224 jobs in Arkansas; hand packer, 21,485 jobs nationally and 197 jobs in Arkansas);

Fusher v. Colvin, No. 2:14-CV-02223, 2015 WL 4038892, at *6 (W.D. Ark. July 2, 2015) (machine tender, 16,500 jobs nationwide and 220 jobs in Arkansas; assembler, 22,100 jobs nationally and 182 jobs in Arkansas; inspector, 4,000 jobs nationally and 50 jobs in Arkansas);

Lenderman v. Colvin, No. 3:14-CV-00245, 2015 WL 4988278, at *4 (E.D. Ark. July 29, 2015) (silver wrapper, 107,457 jobs nationally and 846 jobs in Arkansas; small products assembly, 1,427 jobs nationally and 27 jobs in Arkansas); and

Gholston v. Colvin, No. 14-CV-2064, 2015 WL 6167824 (N.D. Iowa Oct. 21, 2015) (document preparer, 32,700 jobs nationally and 350 jobs in Iowa; addresser, 25,000 nationally and 200 positions in Iowa).

Significant to the analysis is that in each of these cases the Commissioner identified a specific number of jobs available in the claimant's state of residence.

Other circuit courts resolve the issue of significant number of jobs by looking at a state or an area smaller than an entire state. See Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 jobs in a nine-county area, including Dayton, Ohio, constituted a significant number); Barker v. Secretary of Health & Human Services, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 positions in the Los

Angeles/Orange County area were within the parameters of a significant number of jobs); Trimiar v. Sullivan, 966 F.2d 1326, 1330–32 (10th Cir.1992) (while refusing to draw "a bright line," the court found 850–1,000 potential jobs in Oklahoma were a significant number of jobs); Lee v. Sullivan, 988 F.2d 789, 792 & 794 (7th Cir. 1993) (1,400 jobs in the greater Milwaukee metropolitan area constituted "a significant number of jobs.").

"[T]he term 'region . . . is flexible' and can refer to 'the entire state' or to 'a particular area of the state.' " Vargas v. Colvin, No. CV 13-2116, 2013 WL 6254784, at *4 (C.D. Cal. Dec. 4, 2013) (citing Social Security Law and Practice § 43:137 (Dec. 2013); also referencing Harvey L. McCormick, Social Security Claims and Procedures § 8:55 (6th ed. 2011)). "[V]ocational experts who testify in social security disability cases concerning the availability of jobs that the applicant has the physical ability to perform almost always confine their testimony to indicating the number of such jobs that exist in the applicant's state, or an even smaller area." Barrett v. Barnhart, 368 F.3d 691, 692 (7th Cir. 2004) (referencing Fastner v. Barnhart, 324 F.3d 981, 985 (8th Cir. 2003) ("Even considering the narrow range of work Fastner was capable of performing, the ALJ found that the Commissioner had shown that there were a significant number of jobs that existed in the state [Minnesota] economy for Fastner."); other citations omitted).

"In practice, the principal significance of the 'other regions' language in the statute is to prevent the Social Security Administration from denying benefits on

the basis of 'isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the applicant] live[s] . . . .' " Barrett, 368 F.3d at 692 (citing 20 CFR § 404.1566(b). As a practical matter, the court "should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." Jenkins, 861 F.2d at 1087. The issue is always "fact-intensive." Johnson, 108 F.3d at 181 n.3.

ALJ #5 concluded Ms. Patton could work in three jobs: final assembler, 30,100 jobs nationally and 92 jobs regionally; dowel inspector, 14,030 jobs nationally and 40 jobs regionally; and bench hand, with 30,200 jobs nationally and 95 jobs regionally. (AR at p. 1840). ALJ #5 found "the numbers of jobs available in the national economy are significant." Id.; see also Docket 98 ¶ 80. The Appeals Council permitted this decision to stand as the Commissioner's final administrative decision. (Docket 98 ¶ 83).

It must be remembered that ALJ #2 found Ms. Patton not disabled because she could perform three sedentary jobs, specifically: microfilm document preparer, with 100,000 jobs in the national economy; addresser, with 20,000 jobs in the national economy; and sack repairer with 12,000 jobs in the national economy. (Docket 98 ¶ 38 and AR at p. 684). The Appeals Council expressed

concern because this finding did not consider the testimony of the vocational expert which identified the following local jobs in the state of South Dakota: microfilm document preparer, 200 local jobs; addresser, 100 local jobs; and sack repairer, 50 local jobs.   (Docket 98 ¶ 45) (referencing AR at p. 703).   The Appeals Council remanded the case declaring "[a]lthough the number of national jobs appears to represent a significant number of jobs, <u>the number of local jobs identified does not appear to represent a significant number of jobs</u>. Accordingly, further evaluation as to whether a significant number of other jobs exist is necessary."   (AR at p. 703) (emphasis).

Incredibly, in 2015 the Commissioner presented **no** testimony of the number of jobs available to Ms. Patton in the state of South Dakota or the impact upon her if she is compelled to travel to the other regions or nationally for work. This total absence of evidence cannot and does not sustain the Commissioner's burden at step five.   <u>Stormo</u>, 377 F.3d at 806.   The Appeals Council's own determination in 2014 that 350 jobs in South Dakota would not satisfy the requirements of § 404.1566 is a strong endorsement that ALJ #5's decision is not sustainable.[26]   Furthermore, the court is unable to identify one case in the Eighth Circuit which would support a conclusion that 227 jobs in the surrounding states of Wyoming, Montana and North Dakota satisfy the

---

[26]Had the Appeals Council in 2014 believed the national numbers satisfied § 404.1566, there would have been no need to comment on that section of the ALJ's decision or remand for development of additional job evidence because the step five evaluation would have been satisfied by the national numbers.   <u>See</u> AR at pp. 931-32.

"significant number" criteria of 20 CFR §§ 404.1566(b) & (d) for a South Dakota resident.   The court concludes an error of law has been committed.   Smith, 982 F.2d at 311.

In addition, the absence of evidence to support ALJ #5's finding of a significant number of jobs being available to Ms. Patton as a resident of South Dakota "fairly detracts from that decision."   Reed, 399 F.3d at 920.   The court finds ALJ #5's decision is not supported by substantial evidence.   42 U.S.C. § 405(g); Choate, 457 F.3d at 869 (8th Cir. 2006); Howard, 255 F.3d at 580.

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing.   42 U.S.C. § 409(g).   When an error exists in an administrative determination, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."   INS v. Ventura, 537 U.S. 12, 16 (2002) (citations and quotations omitted).   In this case there has already been one judicial remand, four Appeals Council remands and six ALJ decisions.   Requiring remand for yet another administrative proceeding "would contribute to waste and delay and would provide no incentive to the ALJ to fulfill [their] obligation to develop the record."   Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004).   "[P]ermitting the Commissioner to try again to prove the existence of significant numbers of jobs [Ms. Patton] can perform despite her debilitating impairments would . . . create the kind of 'heads we win; tails, let's play again' system of

adjudication decried in <u>Benecke</u> [379 F.3d at 595]."[27]   <u>Vargas</u>, 2013 WL 6254784, at *4.   Enough is enough.

Remand to the Commissioner is neither necessary nor appropriate in this case.   If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate."   <u>Thompson v. Sullivan</u>, 957 F.2d 611, 614 (8th Cir. 1992).   Ms. Patton was disabled during the time period of August 8, 2006, through December 28, 2014, and entitled to benefits. Reversal is the appropriate remedy at this juncture.   <u>Thompson</u>, <u>supra</u>.

## ORDER

Based on the above analysis, it is

ORDERED that plaintiff's motion (Docket 99) is granted in part.

IT IS FURTHER ORDERED that the decision of the Commissioner of January 13, 2016, as it relates to an award of DIB and SSI benefits beginning December 29, 2014, is affirmed.

IT IS FURTHER ORDERED that the decision of the Commissioner of January 13, 2016, as it relates to the denial of DIB and SSI benefits prior to December 29, 2014, is reversed and the case is remanded to the Commissioner

---

[27]<u>Benecke</u> involved only one administrative decision, a district court order directing a reversal and remand for further proceedings, and an appeal to the Eighth Circuit where the court ordered a remand directing the Commissioner to award benefits.   <u>Benecke</u>, 379 F.3d at pp. 589 & 596.   That record is a far cry from the long and convoluted journey Ms. Patton has endured.

for the purpose of calculating and awarding benefits to the plaintiff Mayda J.

Patton for the period of August 8, 2006, through December 28, 2014.

Dated February 28, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE